IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD HARDCASTLE, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | (DEATH PENALTY |
| v. | : | HABEAS CORPUS) |
| | : | |
| MARTIN HORN, ET AL., | : | |
| Respondents | : | NO. 98-3028 |

---

**MEMORANDUM**

**Padova, J.**                                                          **October 19, 2007**

Before the Court, for the second time, is Donald Hardcastle's Amended Petition for Writ of

Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  On June 27, 2001, we granted Hardcastle's

Amended Petition, finding that the Pennsylvania Supreme Court's adjudication of his claim that the

prosecutor exercised racially discriminatory peremptory challenges during jury selection was

contrary to, and involved an unreasonable application of, established federal law as defined by the

United States Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986).  See Hardcastle v. Horn,

Civ.A.No. 98-3028, 2001 WL 722781 (E.D. Pa. June 27, 2001), vacated 368 F.3d 246 (3d Cir.

2004).  We also found that Hardcastle had established, in accordance with Batson, that the

prosecutor engaged in intentional racial discrimination when she peremptorily struck six African-

American venirepersons.  Id.  On May 11, 2004, the United States Court of Appeals for the Third

Circuit vacated our Order granting the Amended Petition.  Hardcastle v. Horn, 368 F.3d 246 (3d Cir.

2004).  Although the Third Circuit agreed that the Pennsylvania Supreme Court's analysis of

Hardcastle's Batson claim was objectively unreasonable, it vacated our grant of the writ of habeas

corpus and remanded the case so that we could hold an evidentiary hearing, allowing the

Commonwealth an opportunity to present evidence regarding the bases for its strikes of African-

American venirepersons.  Id. at 250, 260, 262.  Having considered the evidence presented by the Commonwealth during that evidentiary hearing with respect to the reasons for its strikes of African-American venirepersons at Hardcastle's trial, and for the reasons that follow, we conclude that Hardcastle is entitled to a writ of habeas corpus based on Claim Seven of the Amended Petition, alleging the racially discriminatory exercise of peremptory challenges by the prosecutor during jury selection.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On December 8, 1982, Hardcastle was convicted by a jury of first degree murder, arson and burglary in the May 23, 1982 stabbing deaths of Joseph Gregg and Ernestine Dennis.  (12/8/82 Tr. at 11-12.)  Gregg and Dennis were killed in Gregg's home, which was then set on fire.  Hardcastle, 368 F.3d at 251.  Neighbors had seen Hardcastle near Gregg's home around the time of the murders.  Id.

Hardcastle is African-American.  It is undisputed that the jury at his trial consisted of one African-American juror, eleven white jurors, and two white alternate jurors.  The venire included 33 African-Americans (Ex. C-1), fourteen of whom the Commonwealth had the opportunity to accept or reject.[1]  Hardcastle, 368 F.3d at 251.  During the course of voir dire, the prosecutor used twelve of her twenty peremptory strikes to remove African-American members of the venire.  Id. She also used one of her peremptory strikes to remove a Hispanic member of the venire and two to remove white members of the venire.  (11/15/82 N.T. at 22-30; 11/17/82 N.T. at 121-28; 11/19/87 N.T. at 95-99; Ex. C-1.)  Hardcastle's trial counsel moved for a mistrial following voir dire, arguing

---

[1]Of the 33 African American members of the venire, nineteen were eliminated for cause. (See infra Section IV.A and Ex. D-4.)

that the prosecutor had used her peremptory strikes based on race in violation of the state and federal constitutions.  Hardcastle, 368 F.3d at 251.  The trial court denied his motion based upon Swain v. Alabama, 380 U.S. 202 (1965),[2] and also denied the prosecutor's request to place her reasons for her peremptory strikes on the record.  Hardcastle, 368 F.3d at 251.

Hardcastle raised the issue again in his post-trial motions.  Id.  A three judge panel of the Philadelphia County Court of Common Pleas granted a new trial based upon this issue.  Id.  The Pennsylvania Superior Court reversed the order of the three judge panel granting Hardcastle a new trial, holding that Hardcastle had failed to make the showing required by Swain and affirmed Hardcastle's conviction.  Id.  The Pennsylvania Supreme Court initially granted allocatur, but later dismissed the appeal.  Id. at 251-52.  The case was then remanded to the Court of Common Pleas for sentencing.  Id. at 252.  Hardcastle was sentenced to death for the murders of Gregg and Dennis and to terms of 2½ to 5 years imprisonment for arson and 2½ to 5 years imprisonment for burglary.  Id. at 252.  Hardcastle appealed to the Pennsylvania Supreme Court and reasserted his challenge to the prosecutor's use of peremptory challenges to African-American jurors, this time relying on Batson.  Id.  The Pennsylvania Supreme Court rejected Hardcastle's appeal and affirmed his

_____

[2]At the time of Hardcastle's trial, claims that the prosecutor had violated equal protection through the use of racially discriminatory peremptory challenges were analyzed pursuant to Swain. The Supreme Court recognized in Swain that a prosecutor could violate the Equal Protection Clause by using "his challenges to exclude blacks from the jury 'for reasons wholly unrelated to the outcome of the particular case on trial' or to deny to blacks 'the same right and opportunity to participate in the administration of justice enjoyed by the white population.'" Batson, 476 U.S. at 91 (quoting Swain, 380 U.S. at 224).  Under Swain, in order to make out a prima facie case that the prosecutor was exercising his peremptory challenges in a discriminatory manner in violation of the Equal Protection Clause, a defendant would need "evidence that a prosecutor, 'in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries.'" Id. at 91-92 (quoting Swain, 380 U.S. at 223).

conviction and sentence.  Commonwealth v. Hardcastle, 546 A.2d 1101 (Pa. 1988).  Hardcastle subsequently raised his Batson claim in a motion filed pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541.  Hardcastle, 368 F.3d at 253.  Hardcastle's PCRA motion was denied by the Court of Common Pleas and the Pennsylvania Supreme Court affirmed the denial of the PCRA motion.  Commonwealth v. Hardcastle, 701 A.2d 541 (Pa. 1998).

Hardcastle commenced this habeas proceeding on December 30, 1998.  After extensive briefing and oral argument, we concluded, based upon the two decisions of the Pennsylvania Supreme Court and our analysis of the state court record, that the Pennsylvania Supreme Court's denial of Hardcastle's claim that the prosecutor exercised her peremptory strikes in a racially discriminatory manner that violated the Equal Protection Clause was both contrary to and an unreasonable application of Batson.  Hardcastle v. Horn, 2001 WL 722781, at *10-*15.  We further determined that, as a result of the passage of time since Hardcastle's trial, an evidentiary hearing on the Batson claim would be unlikely to be helpful.  Id. at *19.  As a result, we conducted a *de novo* review of Hardcastle's Batson claim based upon the state court record, and held that Hardcastle had established that the prosecutor intentionally exercised her peremptory challenges in a racially discriminatory manner with respect to six African-American members of the venire, granted the writ, and stayed the writ for 180 days to allow the Commonwealth to retry Hardcastle before a properly selected jury.  Id. at *15, *18-*19.

In vacating our Order granting the writ, the Third Circuit agreed that the Pennsylvania Supreme Court's application of Batson was objectively unreasonable.  Hardcastle, 368 F.3d at 259. However, the Third Circuit disagreed with our decision to forgo an evidentiary hearing and held that the Commonwealth was entitled to an opportunity to supplement the record with evidence of the

4

bases for its peremptory strikes of African-American venirepersons.[3]  Id. at 260.  In accordance with

the direction of the Third Circuit that we allow the Commonwealth to supplement the evidentiary

record with respect to Hardcastle's Batson claim, we held an evidentiary hearing on October 12,

2006 and January 8, 2007 (the "Hearing").   The Commonwealth put on the testimony of the

prosecutor, Judith Rubino, regarding the voir dire and entered her notes taken during the voir dire

into evidence.  (Ex. C-1.)  Notes which she had made in preparation for the Hearing were entered

into evidence by Hardcastle, along with briefs which had been submitted in support of and in

opposition to Hardcastle's post-trial motion in state court.  (Exs. D-1, D-2, D-4 and D-5.)

## II.    THE BATSON ANALYSIS

Under Batson, we apply a three-step burden shifting analysis to Hardcastle's claim that the

prosecutor violated the Equal Protection Clause by exercising racially discriminatory peremptory

challenges.  At step one, "a defendant may establish a prima facie case of purposeful discrimination

in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory

challenges at the defendant's trial."  Batson, 476 U.S. at 96.  A petitioner may establish his prima

facie case by showing that he is "a member of a cognizable racial group" and that the prosecutor

---

[3]The Third Circuit explained its reasoning as follows:

> Although we agree with the District Court's statement that it will be
> difficult at this late date to reconstruct the bases for the challenged
> strikes, we cannot agree with its conclusion that, under the facts of
> this case, the Commonwealth is not entitled to attempt to do so or that
> the state of the evidentiary record will not be improved as a result
> thereof.   In so holding, we are persuaded by the fact that, despite the
> prosecutor's offer to state the bases for her peremptory strikes on the
> record immediately following voir dire and her subsequent request for
> some form of hearing, the Commonwealth has never been provided
> with either a state or federal forum in which to present evidence in
> defense of its actions in this case.

Hardcastle, 368 F.3d at 260.

exercised peremptory strikes against members of his racial group in the venire. Id. (citation omitted).

The petitioner "must show that these facts and any other relevant circumstances raise an inference

that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their

race." Id. Once the petitioner makes a prima facie showing of racial discrimination, step two

requires the state to articulate a race-neutral explanation for its use of peremptory challenges. Id. at

97. The prosecutor must "give a clear and reasonably specific explanation of his legitimate reasons

for exercising the challenges." Id. at 98 n.20 (quotation omitted). If the state is able to come forward

with race-neutral explanations for its peremptory strikes at step two, the trial court must determine,

at step three, whether the defendant has established purposeful discrimination. Id. at 98; Miller-El

v. Dretke, 545 U.S. 231, 239 (2005) (citing Batson, 476 U.S. at 98). "The ultimate burden of

persuasion regarding racial motivation rests with, and does not shift from, the [petitioner]." Riley

v. Taylor, 277 F.3d 261, 275 (3d Cir. 2001) (en banc) (citing Purkett v. Elem, 514 U.S. 765, 768

(1995) (per curiam)).

The Commonwealth has conceded that Hardcastle has satisfied his step one obligation of

establishing a prima facie case of racially discriminatory jury selection.[4]  (10/12/06 N.T. at 2-3,

---

[4]During the Hearing, we asked counsel for the Commonwealth whether the Commonwealth had conceded step one. (10/12/06 N.T. at 2.) The Commonwealth responded as follows:

> I think we can. I just want to say for the record that our position in
> this court in the Third Circuit was not so much that we conceded the
> first step, but that it's our position that the three-step process
> shouldn't really apply at all in the post-trial [context]. Given that and
> given the Third Circuit's decision in your court, your earlier decision,
> your Honor, I think it's appropriate that we move to Step 2 in your
> analysis.

(Id. at 3.) Counsel for the Commonwealth reiterated this position during the Argument held on June 6, 2007: "my view is the three-step process is moot. The only point of step one is to get to step two. We're already obviously at step two." (6/6/07 Tr. at 41.)

6/6/07 N.T. at 41.)  Accordingly, we proceed to the second step of the <u>Batson</u> analysis, to determine whether the prosecutor has articulated race-neutral explanations for her peremptory strikes of African-American members of the venire.

III.    STEP TWO OF THE BATSON ANALYSIS

      A.    <u>The Commonwealth's Evidentiary Burden</u>

The burden of production on the Commonwealth at step two is not high; the Commonwealth need not produce "'an explanation that is persuasive, or even plausible.'  Rather, the sole issue at step two 'is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" <u>Hardcastle</u>, 368 F.3d at 257 (quoting <u>Purkett</u>, 514 U.S. at 768).  However, a general denial of discrimination is not enough to satisfy the Commonwealth's burden at step two.  <u>Batson</u>, 476 U.S. at 98.  The burden imposed by <u>Batson</u> requires articulating "a 'clear and reasonably specific' explanation of [the prosecutor's] 'legitimate reasons' for exercising the challenges." <u>Id.</u> at 98, n.20 (quoting <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981)).

The prosecutor testified during the evidentiary hearing that, although she remembers this case very well, she has no independent recollection of the voir dire or of any of the venirepersons. (10/12/06 N.T. at 6-7, 19-20, 98.)  Consequently, her testimony focused on her experience and training as a prosecutor, her general practices in voir dire, her notes from the voir dire, and her analysis of the voir dire transcript.  (<u>Id.</u> at 5-7, 15, 19-24.)  "[C]ircumstantial as well as direct evidence can be used to carry the state's burden of production at the second step in a <u>Batson</u> analysis." <u>Johnson v. Love</u>, 40 F.3d 658, 668 (3d Cir. 1994).  <u>Batson</u> does, however,

        require that the state's evidence, direct or circumstantial, be such that,

> if credited, it will establish that invidious discrimination played no
> role in the prosecutor's challenge.  Stated conversely, the Batson
> inquiry ends and the conviction must be vacated at the second stage
> of the analysis if the state's explanation is such that, taken at face
> value, it either demonstrates an equal protection violation . . . or
> would otherwise be inadequate as a matter of law to support the
> conviction."

Johnson at 668 (citations omitted).  While the Third Circuit has held that the exclusion of even one

minority venireman from the jury on the basis of race is sufficient to require a new trial pursuant to

Batson, see Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990), it has also "expressly rejected the

notion that our prior precedent mandates relief in situations in which the prosecutor concedes that

he or she cannot remember the bases for a challenged strike . . . ."  Hardcastle, 368 F.3d at 260

(citing Johnson, 40 F.3d at 667 n.4 (suggesting that the state should be permitted to reconstruct the

bases for the prosecutor's strikes when the prosecutor is unable to recall her reasons for striking

jurors)).

Thus, an attempt by the Commonwealth to reconstruct the decision-making process is

permissible, so long as the evidence presented is supported by the record.  Johnson v. Vasquez, 3

F.3d 1327, 1331 (9th Cir. 1993) (noting that a court is not required to accept a race neutral

explanation that is not supported by the record) (cited with approval in Riley, 277 F.3d at 279).  As

the Third Circuit made clear in Riley, "[t]he inquiry required by Batson must be focused on the

distinctions actually offered by the State in the state court, not on all possible distinctions we can

hypothesize . . . .  Apparent or potential reasons do not shed any light on the prosecutor's intent or

state of mind when making the peremptory challenge."  Riley, 277 F.3d at 282 (citations omitted).

B.      <u>The Prosecutor's Experience and General Practices</u>

The prosecutor testified that she was a homicide prosecutor for 31½ of the 33 years she was a Philadelphia Assistant District Attorney.  (10/12/06 N.T. at 5.)  During that time, she conducted hundreds of trials, both jury and non-jury.  (<u>Id.</u>)  It was her practice to take notes during jury selection.  (<u>Id.</u> at 13.)

The Commonwealth entered into evidence her notes from the <u>Hardcastle</u> voir dire.  (<u>Id.</u> at 8, Ex. C-1.)  These notes consist of a one page list of venirepersons who were stricken by the Commonwealth and by the defense, nine pages of notes on the members of the venire, and a one page list of the individuals who were selected to sit on the jury.  (<u>Id.</u> at 8-10, Ex. C-1.)  According to the notes, 132 members of the venire were questioned before the jury was seated.[5]  (Ex. C-1.)  The notes were not comprehensive, but were the prosecutor's "shorthand method of keeping track of different things that the jurors said at the time that they were being said . . . ."  (10/12/06 N.T. at 13.)  In addition to recording things that venirepersons said during voir dire, the notes also reflect each juror's race.  (<u>Id.</u> at 26.)  The notes on individual venirepersons and the list of individuals who were selected to serve on the jury use the subscript "2" to denote African-American venirepersons and the subscript "3" to denote members of other racial or ethnic groups (such as Hispanics).  (<u>Id.</u> at 26-27, Ex. C-1.)  If a person's race was not noted on the list of each venireperson, that person was a "1." (<u>Id.</u> at 27.)  The subscript "1" was used to denote Caucasian members of the venire on the strike list. (<u>Id.</u> at 26-28, Ex. C-1.)  The prosecutor testified that she kept track of juror demographics because she believed that it was her responsibility to do so under <u>Swain</u>.  (10/12/06 N.T. at 27-28.)

---

[5]The prosecutor's notes list only 131 numbered members of the venire, however, she used the number 123 for both Janice Ferrell and Theresa Petruska.  (Ex. C-1.)

The prosecutor did not have any independent or refreshed recollection of why she struck any particular member of the venire.  (Id. at 20, 22-23, 37, 42-43.)  Her testimony was, therefore, based upon her notes, the transcript of the voir dire, and the factors which were ordinarily important to her in selecting a jury.  (Id. at 20, 29-31, 42-43.)  She testified about the characteristics she normally took into consideration in selecting a jury and whether these characteristics were possessed by each member of the venire.  (Id. at 20, 28-33, 41-43.)  She also testified that she "wanted an intelligent jury, because this was a circumstantial evidence case."  (Id. at 30.)  Other factors which were consistent with her practices for selecting jurors were:  strength on the death penalty, prior jury service, relatives or friends who are police officers, military service, stable employment history, being older, being married, having children, having relatives who had been victims of crime, attending parochial school, being from a small town originally, post-high school or college education, employment as a teacher, and living with members of one's immediate family.  (Id. at 41, 43-45, 50, 54-55, 63-64, 66, 68-70, 72, 74, 76, 80, 82-85, 87.)  The prosecutor also testified that the following factors would be consistent with her practices for striking jurors:  being single, being a single parent, unemployment, youth, not quickly understanding questions asked during voir dire, nervousness during voir dire, weakness on the death penalty, having a relative who was a crime victim, having children close in age to the defendant, working with children, education or work in a psychiatry related field, not completing high school, having a relative who had been arrested or convicted of a crime, indicating a reluctance to follow the court's instructions on the law, being underemployed, and having a relative who is a criminal lawyer.  (Id. at 46-47, 53, 56-57, 60-62, 65, 71, 72, 77-79, 81-82.)

The Fourteen African-American members of the venire whom the Commonwealth had the

opportunity to strike or accept at Hardcastle's trial were:  Lisa Stewart, William Preston, Adrienne Marsh, Catherine Taylor, Elizabeth Milliner, Marian Johnson, Shirley Davis, Kim Richards, Gladys Workman, Lorraine Fox, James Richardson, Mary Powell, Mary Henry, and Janice Ferrell (Id. at 46, 49, 51, 53-54, 56, 58-62, 65-66, 71-72, 76-82, Ex. C-1.)  The Commonwealth accepted as jurors Elizabeth Milliner and Mary Powell;[6] the prosecutor exercised peremptory challenges on the remaining African-American members of the venire. (Ex. C-1.)  She also exercised peremptory challenges on Eileen Conway, a  Caucasian woman, Anthony Aiello, a Caucasian man who was considered as an alternate juror,[7] and Iris Garayua, an Hispanic woman.  (10/12/06 N.T. at 25-26, 72-73, 86-87.)

> 1.    The Commonwealth's race-neutral reasons for striking African-American members of the venire

The prosecutor testified that the African American members of the venire she struck had race neutral characteristics which were consistent with her normal practices for striking jurors as follows:

Lisa Stewart:  The prosecutor testified that Stewart "was a single mother, unemployed, she was young, she did not seem to understand quickly what counsel . . . was asking.  (Id. at 46.)  The prosecutor's contemporaneous notes reflect that Stewart was unmarried, was African-American, was a mother of one child, lived in West Philadelphia, and was never a crime victim.  (Ex. C-1.)  The prosecutor did not ask Stewart any questions during voir dire.  (Id. at 48, 11/15/82 N.T. at 115-16.)

William Preston:  The prosecutor testified that Preston was single, his sister had been raped six or seven years before and he did not attend the trial, and he couldn't definitely say that he could

---

[6]Mary Powell was stricken by counsel for  Hardcastle.

[7]Each side was given one peremptory strike to exercise in selection of the two alternate jurors. (10/12/06 N.T. at 84-85.)

11

return the death penalty.  (10/12/06 N.T. at 51.)  The prosecutor's contemporaneous notes state that Preston was single, African-American, worked in a managerial role, lived alone in the Logan section of Philadelphia, was 32 years-old, and had attended South Philadelphia High School through twelfth grade; the notes also indicate that his sister had been a crime victim six to seven years before.  (Ex. C-1.)  During voir dire, the prosecutor questioned Preston about his employment, his education, the area of Philadelphia in which he lived, his sister's rape, whether her rape affected his ability to be a fair and impartial juror, and his beliefs regarding the death penalty.  (11/16/82 N.T. at 5-8.)

Adrienne Marsh:  The prosecutor testified that Marsh read about the case in the newspaper, had been a school aide for nine years in Mount Airy, and had five children, ranging in age from 17-27.  (10/12/06 N.T. at 53.)  The prosecutor believes now that, at the time of voir dire, she would have assumed that Marsh would have been sympathetic to Hardcastle because he was close in age to her children, and because she worked with children.  (Id. at 53-54.)  The prosecutor's contemporaneous notes indicate that Marsh had five children ages 17-27, that she had been an aide in the school system for nine years, that she had heard about this case before trial, and that her husband was a dry wall finisher.  (Ex. C-1.)  During voir dire, the prosecutor asked Marsh about her husband's employment, the ages of her children, and her willingness to follow the court's legal instructions.  (11/16/82 N.T. at 12-14.)

Catherine Taylor:  The prosecutor testified that Taylor indicated that she did not know whether she could return the death penalty; that she had taken care of delinquent children for 25 years at Eastern Psychiatric Hospital and might look beyond the evidence for the defendant's motivation; that she had a tenth grade education, and she was very weak on her ability to bring back the death penalty.  (10/12/06 N.T. at 55-58.)  The prosecutor's contemporaneous notes state that

Taylor lived in Mt. Airy, her husband had died, she had been employed for 25 years at Eastern Psychiatric Hospital, and she had two children, ages 41 and 42.  (Ex. C-1.)  During voir dire, the prosecutor asked Taylor whether she could return the death penalty and asked about her previous employment at Eastern Psychiatric Hospital, her education, her husband, her children, and the area of the Philadelphia in which she lived.  (11/16/82 N.T. at 22-26.)

Marian Johnson:  The prosecutor testified that Johnson was unemployed, did not understand a voir dire question about whether she had any relatives who were crime victims, and had a sister and nephews who had been arrested for drug crimes.  (10/12/06 N.T. at 60-62.)  The prosecutor's contemporaneous notes state that Johnson's nephews and other relatives had been arrested for drugs and that she was unemployed.  (Ex. C-1.)  During voir dire, the prosecutor asked Johnson about her employment history, her sister and nephew who had been arrested for drugs, and whether she could return the death penalty.  (11/17/82 N.T. at 12-14.)

Shirley Davis:  The prosecutor testified that Davis was unemployed, had two children ages 14 and 15, had a tenth grade education, and said that she would not follow the court's legal instructions.  (10/12/06 N.T. at 65.)  The prosecutor's contemporaneous notes state that Davis was married, her husband was an upholstery worker, and she had two children, ages 14 and 15.  (Ex. C-1.)  During voir dire, the prosecutor asked Davis where she lived, whether she was employed, what work her husband did, the ages of her children, the extent of her education, whether she or a family member had been a crime victim, whether she could be an impartial juror, and whether she could follow the judge's legal instructions.  (11/17/82 N.T. at 47-50.)

Kim Richards:  The prosecutor testified that Richards was 26 years old, lived alone, worked as a secretary even though she had a college degree in psychology, and was over-qualified for her

job.  (10/12/06 N.T. at 71.)  The prosecutor's contemporaneous notes state that Richards was 26 years old, had a degree in psychology from Lincoln University, and had worked for an exterminating company for less than two years.  (Ex. C-1.)  During voir dire, the prosecutor asked Richards about her age, education, living arrangements, and employment history.  (11/17/82 N.T. at 95-96.)

Gladys Workman:  The prosecutor testified that Workman was 24 years old, worked as a data entry operator, had one year of college as an x-ray technician, attended William Penn High School, seemed nervous during voir dire, and indicated that she would not follow the court's legal instructions if she disagreed with them.   (10/12/06 N.T. at 76-77.)   The prosecutor's contemporaneous notes state that Workman worked for an insurance company as a data entry operator, had one year in x-ray, lived in West Philadelphia, and went to William Penn High School. (Ex. C-1.)  During voir dire, the prosecutor asked about Workman's age, employment, educational history, whether she could follow the judge's instructions on the law and whether she or any family members had been crime victims.  (11/18/82 N.T. at 41-44.)  The prosecutor told Workman to relax because she looked nervous.  (Id. at 41-42.)

Lorraine Fox:  The prosecutor testified that Fox was 23 years old and single, her brother had gone to jail for robbery, and she had attended his trial.  (10/12/06 N.T. at 77-78.)  The prosecutor's contemporaneous notes state that Fox had been a private nurse for three years, went to West Philadelphia High School, lived in West Philadelphia, and her brother had a robbery conviction four years before.  (Ex. C-1.)  During voir dire, the prosecutor asked Fox about her age, marital status and education.  (11/18/82 N.T. at 58.)  The prosecutor also asked Fox about her living arrangements and whether any of her friends or family members had been convicted of crime.  (Id. at 59.)  She also asked Fox about her brother's trial and whether she bore any ill will toward the Police Department,

14

District Attorney's Office or court as a result of her brother's trial.  (Id. at 60.)

James Richardson:  The prosecutor testified that Richardson was a DPW case worker, had previously been a meat cutter, and his brother had been killed eight years before but no one had been arrested.  (10/12/06 N.T. at 78.)  The prosecutor stated that it is her practice not to take jurors "where someone has been killed but no one has been arrested," because the family members sometimes hold it against the homicide detectives and might hold it against the Commonwealth.  (Id. at 79.)  The prosecutor's contemporaneous notes state that Richardson was a DPW caseworker, his previous job was at Acme Markets, he was single, he had lived in north Philadelphia his whole life, and his brother had been killed eight years before.  (Ex. C-1.)  During voir dire, the prosecutor asked Richardson whether he would give less weight to the testimony of a police officer than that of a civilian, what his educational background was, what his current and previous jobs were, and where he attended high school.  (11/18/82 N.T. at 63-64.)  The prosecutor also asked Richardson about his living arrangements, whether there was any reason why he could not be fair and impartial, and whether he would follow the judge's instructions on the law.  (Id. at 64-65.)

Mary Henry:  The prosecutor testified that Mary Henry was a registered nurse with six children ages 10-21, did not understand a voir dire question about whether she or a relative had been a crime victim, had a son who had been convicted of rape the year before, and seemed to have a degree of ill will toward the police, District Attorney and the court.  (10/12/06 N.T. at 81.)  The prosecutor's contemporaneous notes state that Mary Henry was a hospital nurse, had six children ages 10-21, her husband was an electrician, and her son had been convicted of rape in 1981.  (Ex. C-1.)  During voir dire, the prosecutor asked Henry about her son's trial and whether, as a result, she bore any ill will toward the Police Department, the District Attorney's Office or the court system.

(11/19/82 N.T. at 44.)  Henry responded to the ill will question by stating that she did not feel ill will

"to the point that I could not be fair with anybody else . . . ."  (Id. at 44.)

Janice Ferrell:  The prosecutor testified that Ferrell was single, unemployed, and the exact

same age as the Defendant.  (10/12/06 N.T. at 82.)  The prosecutor's contemporaneous notes state

that Ferrell was 20, went to Germantown High School, and her mother was a caterer.  (Ex. C-1.)

During voir dire, the prosecutor asked Ferrell her age, whether she had graduated from high school,

whether she was employed, whether she lived with any family members, and how her mother was

employed.  (11/19/82 N.T. at 62-63.)  She also asked Ferrell whether she could be a fair and

impartial juror and whether she could follow the judge's instructions.  (Id. at 63-64.)

The prosecutor also testified that the African American jurors she accepted had race-neutral

characteristics consistent with her practice of accepting jurors:

Elizabeth Milliner:  The prosecutor testified that Milliner was a mature woman who had been

employed by the Navy for 17 years in a responsible position; lived in West Oak Lane and had been

a burglary victim; and was very strong on the death penalty.  (10/12/06 N.T. at 58-60.)  The

prosecutor's contemporaneous notes state that Milliner had hypertension, had a bachelor's degree

in human services, had been a procurement agent for the Navy for 17 years, had been burglarized

12-15 years before, her niece was married to a police officer, and she had read about the case before

trial in the newspaper. (Ex. C-1.)  During voir dire, the prosecutor asked Milliner whether she would

believe the testimony of a police officer more than a civilian, whether she could be fair and impartial,

whether she would follow the court's legal instructions if she did not agree with them; she also asked

about Milliner's educational background.  (11/16/82 N.T. at 79-86.)

Mary Powell:  The prosecutor testified that Powell was mature, professional, smart, had gone

to West Catholic High School, was married to a surgeon, had two years of college in science, had five children ages 15-30, and didn't like violence.  (10/12/06 N.T. at 79-80.)  The prosecutor's contemporaneous notes state that Powell had lived in West Philadelphia all of her life, her husband was a surgeon, she had five children, had two years of college in science and had attend West Catholic High School.  (Ex. C-1.)  During voir dire, the prosecutor asked Powell where she lived, whether she was employed outside of the home, her husband's occupation, the number and ages of her children, whether she or any family members had been victims of violence, whether she could be fair and impartial, whether there was any reason why she could not return a guilty verdict, how far she had gone in college, what high school she attended, and whether she could follow the Judge's instructions on the law whether or not she agreed with the law.  (11/18/82 N.T. at 66-68.)

We find that, although the prosecutor had no independent or refreshed recollection of her reasons for striking particular members of the venire (10/12/87 N.T. at 37-39), the evidence of the factors she commonly employed in making jury selection decisions, combined with her attempt to reconstruct her reasons for making particular strikes by applying those factors to the state court voir dire transcript constitutes circumstantial evidence of her intent in exercising the Commonwealth's peremptory strikes, which evidence receives some support from her contemporaneous notes of the voir dire.  Her testimony, identifying factors that she typically would have taken into account in exercising a peremptory strike, is admissible under Fed. R. Evid. 406.  The Rule provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Habit "describes one's regular response to a repeated specific situation."  Fed. R. Evid. 406 advisory

committee's note (describing conduct that qualifies as habit as "semi-automatic").  It is defined as
"'a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex
behavior in a specific set of circumstances.'"  Perrin v. Anderson, 784 F.2d 1040, 1046 (10th Cir.
1986) (quoting Frase v. Henry, 444 F.2d 1228, 1232 (10th Cir. 1971)).  Based upon this evidence,
we find that the Commonwealth has come forward with facially valid, reasonably specific, race-
neutral reasons for the prosecutor's strikes of African-American members of the venire.  See Batson,
476 U.S. at 98 n.20, Hardcastle, 368 F.3d at 257.   We further find, accordingly, that the
Commonwealth has satisfied its burden at step two of the Batson inquiry and we move to step three.

IV.    STEP THREE OF THE BATSON ANALYSIS

       "In Step Three of Batson, Petitioner must establish, by a preponderance of the evidence, that
[the prosecutor's] decision to strike at least one juror at Petitioner's trial was motivated at least in
part by race."  Wilson v. Beard, 314 F. Supp. 2d 434, 446 (E.D. Pa. 2004), aff'd 426 F.3d 653 (3d
Cir. 2005) (citing McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir. 2003).  "The critical question in
determining whether a prisoner has proved purposeful discrimination at step three is the
persuasiveness of the prosecutor's justification for his peremptory strike."  Miller-El v. Cockrell, 537
U.S. 322, 338-39 (2003).  We consider "how reasonable, or how improbable, the explanations are;
and . . . whether the proffered rationale has some basis in accepted trial strategy."  Id. at 339.  In
making our determination, we address and evaluate "'all evidence introduced by each side (including
all evidence introduced in the first and second steps) that tends to show that race was or was not the
real reason and [determine] whether the defendant has met his burden of persuasion."  Riley, 277
F.3d at 286 (quoting United States v.  McMillon, 14 F.3d 948, 953 n.4 (4th Cir. 1994) and citing
Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000)).  Tools which have proven useful at step three

include statistical analysis of the prosecutor's strikes, <u>Miller-El v. Dretke</u>, 545 U.S. at 241, <u>Miller-El v. Cockrell</u>, 537 U.S. at 342; examination of the nature of the prosecution's pre-<u>Batson</u> defense to the petitioner's claims of discriminatory jury selection, <u>Riley</u>, 277 F.3d at 284-85; and side-by-side comparisons of African-American members of the venire who were struck with Caucasian members of the venire who were accepted by the prosecutor.  <u>Miller-El v. Dretke</u>, 545 U.S. at 241.  These side-by-side comparisons take on special significance because, as the Supreme Court has recognized, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson's</u> third step."  <u>Id.</u>

    A.   <u>Statistical Analysis of Strikes</u>

Hardcastle contends that a statistical analysis of the strikes used by the Commonwealth at Hardcastle's trial helps to establish that the Commonwealth's reliance on the prosecutor's race-neutral explanations for these strikes is unreasonable.  Having reviewed the transcripts of the venire and the prosecutor's contemporaneous notes, we make the following findings of fact with respect to the makeup of the venire.  There were 132 individuals in the venire who were questioned by counsel before the 13 jurors and two alternates were selected.[8]  Thirty-three members of the venire were African-American, 97 were Caucasian, and two were denoted as other with a subscript "3" in the prosecutor's contemporaneous notes.  (Ex. C-1.)  Of the 33 African-American members of the venire, 19 were eliminated for cause, 12 were stricken by the Commonwealth, one was stricken by the defense (after being accepted by the Commonwealth), and one was selected to be a juror.

_____

[8]The first juror selected, Thomas Pytlewski, was excused by agreement on the third day of jury selection, October 17, 1982, because of medical problems.  (11/15/82 N.T. at 63-70, 11/17/82 N.T. at 4-5.)

(11/15/82 N.T. at 30-31, 47-50, 114-17; 11/16/82 N.T. at 3-14, 22-28, 31-36, 45-47, 79-88, 92-93; 11/17/82 N.T. at 8-14, 22-23, 46-53, 83-86, 92-96, 105-07, 128-30; 11/18/82 N.T. at 9-14, 16-17, 18-22, 40-46, 57-72; 11/19/82 at 20-22, 25-26, 29-34, 40-44, 62-64.)  Of the 97 Caucasian members of the venire, 63 were eliminated for cause, two were stricken by the Commonwealth (one during selection of alternate jurors), 18 were stricken by the defense (eight of those were stricken after having been first accepted by the Commonwealth), 12 were selected as jurors (one was later excused for medical reasons), and two were selected as alternates.  (11/15/82 N.T. at 19-30, 32-47, 50-114, 117-23; 11/16/82 N.T. at 2-3, 14-22, 28-31, 36-45, 64-78, 88-94; 11/17/82 N.T. at 6-7, 23-46, 55-83, 86-91, 97-103, 107-121; 11/18/82 N.T. at 2-9, 15-16, 17-18, 22-40, 46-57, 72-81; 11/19/82 N.T. at 18-20, 22-25, 26-29, 34-40, 44-62, 64-106.)   Of the two remaining minority jurors, one was eliminated for cause and one was stricken by the Commonwealth.  (11/17/82 N.T. at 14-21, 121-28.)

Twenty-five percent of the members of the venire were African-American, 73.5% were Caucasian, and 1.5% were members of other minority groups. Even though one-quarter of the venire was African-American, only one African-American served on the jury.  Of the 14 African-American veniremen whom the Commonwealth had the opportunity to accept for jury service, the prosecutor struck 12, or 85.71%.  If the other minority jurors are included in the statistics, the prosecutor used her peremptory strikes to eliminate 13 of the 15 minority members of the venire whom she had the opportunity to accept for jury service, or 86.7%.  Of the 24 Caucasian members of the venire whom the Commonwealth had the opportunity to accept or reject, the prosecutor struck only 2, or 8.3%. Of the 15 individuals accepted for service as jurors or alternates, only one was African-American, or 6.67%.  Hardcastle was ultimately tried by a jury of eleven white jurors (91.67%) and one African-American juror (8.33%).  Given the racial makeup of the venire, "[h]appenstance is unlikely

to produce this disparity."  Miller-El v. Cockrell, 537 U.S. at 342 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members, and only one served on petitioner's jury.  In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans.  Happenstance is unlikely to produce this disparity.")  We find that this statistical analysis of the Commonwealth's strikes supports the conclusion that the prosecutor's post hoc race-neutral explanations for her strikes of African-American members of the venire are unpersuasive.

        B.      The Commonwealth's Pre-Batson Defense to Hardcastle's Claim of Discrimination

Hardcastle also argues that the Commonwealth's pre-Batson defense to his claims that the prosecutor exercised her strikes in a racially discriminatory manner undercuts the persuasiveness of the Commonwealth's present race-neutral explanations for its strikes of African-American venirepersons.  The Third Circuit has recognized that, at the third step, a prosecutor's present race-neutral explanations for his or her strikes must be evaluated in light of any pre-Batson defense to the claim that those strikes were racially discriminatory in violation of the Equal Protection Clause.  Riley. 277 F.3d at 284 (noting that the prosecutor's explanations for striking a black juror "must be evaluated . . . in light of the nature of the State's pre-Batson defense on direct appeal").  At the time of Hardcastle's voir dire, the leading Pennsylvania Supreme Court case regarding intentional racial discrimination in jury selection was Commonwealth v. Henderson, 438 A.2d 951 (Pa. 1981).  Henderson adhered to the holding in Swain that intentional discrimination in jury selection in violation of the Equal Protection Clause could only be proven by a pattern of purposeful discrimination over many cases, "'with the result that no Negroes ever serve on petit juries . . . .'"  Henderson, 438 A.2d at 956 (quoting Swain, 380 U.S. at 223).  Indeed, the Pennsylvania Supreme

Court stated, in <u>Henderson</u>, that the purposeful elimination of African-American venirepersons from a particular jury on the basis of race would not necessarily violate the Constitution:

> it is not constitutional error for a prosecutor to challenge a black juror for the reason that the prosecutor believes -- validly or invalidly -- that a black venireman because of the facts of the case, is less likely to be impartial than a white venireman. Put still more reductively, the race, creed, national origin, sex or other similar characteristics of a venireman may be proper considerations in exercising peremptory challenges when issues relevant to these qualities are present in the case.

<u>Id.</u> at 953.

During the Hearing, the prosecutor was asked about her reliance on <u>Henderson</u> at the time of Hardcastle's trial and denied ever believing that race could be an appropriate consideration in striking jurors. (1/8/07 N.T. at 21-23.) However, she did rely on <u>Henderson</u> in the Commonwealth's opposition to Hardcastle's Motion for a New Trial and For Arrest of Judgment in the Court of Common Pleas (the "Motion for a New Trial"). (Ex. D-2.) Hardcastle claimed, in his Motion for a New Trial, that the Commonwealth's exercise of twelve peremptory challenges against African-American jurors at his trial violated his rights under the Pennsylvania Constitution and the United States Constitution. (4/27/83 Tr. at 8-9.) The Commonwealth did not deny the use of racially motivated peremptory challenges in its Brief in Opposition to Defendant's Motion for a New Trial, but called Hardcastle's claim substantively frivolous because one of the jurors who convicted him appeared to be black and because Hardcastle could not prove that he was the victim of the kind of systematic exclusion of black jurors condemned by <u>Swain</u> and <u>Henderson</u> that prevents black jurors from ever sitting on juries. (Ex. D-2 at 1-3.) The Commonwealth's Brief, which the prosecutor signed, relied on <u>Henderson</u> as follows:

The Supreme Court of Pennsylvania has emphatically rejected the idea that the Commonwealth's exercise of its peremptory challenges is subject to the post-trial or appellate second-guessing demanded by defendant:

> [I]t is not constitutional error for a prosecutor to challenge a black juror for the reason that the prosecutor believes - - validly or invalidly - - that a black venireman because of the facts of the case, is less likely to be impartial than an white venireman. Put still more reductively, the race, creed, national origin, sex or other similar characteristics of a venireman may be proper consideration in exercising peremptory challenges when issues relevant to these qualities are present in the case.

Commonwealth v. Henderson, 497 Pa. 23, 29, 438 A.2d 951(1981). The Court reaffirmed that the use of peremptory challenges may result in unconstitutional racial discrimination only

> when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of jurors who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries.

Id. at 34, quoting Swain v. Alabama, 380 U.S. 202, 223-24, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965).  Defendant has not even alleged, let alone proven, that he was a victim of such systematic exclusion, and his claim therefore must be dismissed.

*     *     *

Where, as here, defendant "merely proffers the bald assertion that the prosecutor systematically used his peremptory challenges to prevent black persons from being jury members . . . [and] fail[s] to produce a scintilla of evidence in support of this proposition" other than the mere fact that few or no blacks were chosen, defendant has not met his burden.  Commonwealth v. Martin, [336 A.2d 290, 297 (Pa. 1975)] (no blacks chosen). Commonwealth v. Edwards, 493 Pa. 281, 426 A.2d 550 (1981) (one black chosen).  See also Commonwealth

v. Brown, 490 Pa. 560 (1980).  Therefore, defendant's argument,
which he acknowledges is contrary to the settled law in this
Commonwealth, must be rejected.

(Ex. D-2 at 1-4.)

The prosecutor reiterated her reliance on Henderson during oral argument on the Motion for

a New Trial.  She again quoted the passage from Henderson which states that "it is not constitutional

error for a prosecutor to challenge a black juror for the reason that the prosecutor believes, validly

or invalidly, that a black venireman, because of the facts of the case, is less likely to be impartial than

a white venireman." (4/27/83 Tr. at 80.)  She also asserted that, if she had exercised her peremptory

challenges in a discriminatory manner, "there would not have been any black juror[s], and there was

a black juror in this case."  (Id. at 81.)  Moreover, when Judge Juanita Kidd Stout indicated that the

number of strikes of African-American venirepersons (12 out of 14) led her to suspect racial

discrimination in this case, and stated that she would also suspect intentional discrimination if the

Commonwealth had used peremptory challenges to eliminate 12 of 14 members of another ethnic

minority, the prosecutor stated: "I don't think that our law has gone to that stage, nor do I think it

should.  (Id. at 84, 87.)

Despite the prosecutor's present disavowal of Henderson, we find that it is clear that she

relied heavily on Henderson to oppose Hardcastle's claim, in the Motion for a New Trial, that his

constitutional rights were violated by the use of racially discriminatory peremptory challenges.  We

further find that the prosecutor's pre-Batson reliance on Henderson, her failure to deny that she used

race-based peremptory challenges either in the Commonwealth's Brief or during the April 23, 1983

hearing, and her statement to Judge Stout regarding the state of the law in 1983, support the

conclusion that her post hoc race-neutral explanations for her strikes are implausible.  See Riley, 277

24

F.3d at 285 (noting that the state's contemporaneous reliance on <u>Swain</u> to defend a claim on direct appeal that it had exercised its strikes in a racially discriminatory manner, together with the state's failure to deny on direct appeal that it exercised its strikes in a racially discriminatory manner "suggests that race was at least a partial basis for its use of peremptory challenges," which suggestion supports the conclusion "that the State's proffered race-neutral explanations are pretextual").

       C.     <u>Side-By-Side Comparison of Jurors</u>

Hardcastle also maintains that a comparison of the characteristics of some of the African-American venirepersons who were stricken by the Commonwealth with the characteristics of the Caucasian venirepersons who were accepted by the Commonwealth is strong evidence that the Commonwealth's strikes of African-Americans were racially discriminatory. Side-by-side comparisons of stricken African-American jurors with Caucasian jurors who were accepted by the prosecution are recognized as powerful tools for determining whether the prosecution's purportedly race-neutral explanations for strikes are plausible. <u>Miller-El v. Dretke</u>, 545 U.S. at 241; <u>see also</u> <u>Riley</u>, 277 F.3d at 282 ("A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual." (listing cases)).

Hardcastle has submitted an exhaustive side-by-side comparison of eight of the African-American members of the venire stricken by the Commonwealth with their Caucasian counterparts. He contends that this comparison, when viewed along with the percentage of African-Americans who served on his jury and the historical context of the jury selection in his case, establishes that the prosecutor's post hoc race-neutral explanations for her peremptory strikes of African-American members of the venire are unpersuasive.

1.    Lisa Stewart

The prosecutor testified during the Hearing that striking Stewart was consistent with her usual practices for striking jurors because Stewart "was a single mother, unemployed, she was young, she did not seem to understand quickly what counsel . . . was asking." (10/12/06 N.T. at 46.) She explained, on cross-examination, that because Stewart was unemployed, had a child and was not married, she was "not in a stable situation." ( Id. at 103.)  Hardcastle maintains that none of these reasons is plausible.  The prosecutor testified that she based her present assumption that Stewart did not seem to understand quickly what counsel was asking on the following excerpt from the voir dire:

Q.    Is there anything about that [the death of two people by stabbing], what would upset anybody, but is there anything about it that would interfere with your ability to be fair and impartial?

A.    Say that again.

Q.    To weigh the evidence fairly?

A.    Yes.

Q.    You'd be able to do that?

A.    Yes.

(10/12/06 N.T. at 46-47, 11/15/82 N.T. at 116.)  When we asked the prosecutor to explain what about this transcript led her to believe that Stewart didn't understand her question, as opposed to not having heard the question, she answered:  "I don't recall Judge." (10/12/06 N.T. at 100.)  We find that the assertion that Stewart "did not understand quickly what counsel . . . was asking" is not supported by the record. The record does, however, establish that the Commonwealth accepted white jurors who misheard, or misunderstood, questions asked by counsel during voir dire.  The prosecutor

26

accepted a white juror, James Dougherty, even though he misunderstood or misheard a question about whether he had ever been a victim of a crime:

> Q.  Have you ever been a victim of a crime yourself?
>
> A.  Yes, sir.
>
> Q.  When was that Mr. Dougherty?
>
> A.  I think it was about three years ago.
>
> Q.  And what type of occurrence was that?
>
> A.  It was an assault charge.
>
> Q.  Was anyone arrested as a result of this incident?
>
> A.  I was arrested and my girlfriend was arrested.

(11/18/82 N.T. at 32.)  The prosecutor also accepted a white juror, Jean Owad, who misheard or misunderstood a question about her willingness to impose the death penalty:

> The Court: You have been sworn.  Do you have any religious, moral or ethical beliefs which could prevent you from voting for the death penalty, assuming, of course, that a proper case for it had been made out?
>
> A. Yes, I do.
>
> The Court: You do.  These are beliefs that you hold firmly.
>
> A.  That's right.
>
> The Court: Well, let me ask you this: if you were placed on this jury, could you, nevertheless, put your personal beliefs aside and vote for the death penalty, assuming always that a proper case had been made out for it?
>
> A.  I probably would, yes.
>
> The Court: You could.  Would you take the stand, please.

27

By Mrs. Rubino:

Q.  Good afternoon.  Is it Mrs. Owad?

A.  Miss.

Q.  I am just having a little difficulty understanding exactly what you mean.  You indicated that you have had firm beliefs against the imposition of capital punishment for some period of time.

A.  No, I don't.  I believe in capital punishment.

(11/15/82 N.T. at 55-56.)  The Commonwealth argues that comparing Stewart to Dougherty and Owad is not probative, because both Owad and Dougherty had characteristics that the prosecutor wanted in jurors she selected that Stewart did not possess.  The prosecutor testified that she accepted Owad because she was strong on the death penalty and because her cousin's husband was a police officer.  (10/12/06 N.T. at 41.)  She also testified that she accepted Dougherty because he was close friends with the brother of a police officer witness at Hardcastle's trial, had served in the Army, and had gone to Catholic school.  (10/12/06 N.T. at 74.)  She also thought that the defense would exercise peremptory strikes against both Owad and Dougherty.  (Id. at 41, 74-75.)  However, the fact that defense counsel struck a juror after the prosecutor accepted that juror isn't relevant to our analysis.  See Miller-El v. Dretke, 545 U.S. at 245 n.4 ("The fact that Witt and other venire members discussed here were peremptorily struck by the defense is not relevant to our point.  For each of them, the defense did not make a decision to exercise a peremptory until after the prosecution decided whether to accept or reject, so each was accepted by the prosecution before being ultimately struck by the defense.").  We find that a comparison of the prosecutor's treatment of Stewart with her treatment of these two Caucasian jurors, who also may have misheard or misunderstood questions asked during voir dire, is probative, as there is no requirement  that the jurors compared be identical in all respects

28

except race:

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one . . . .  A per se rule that a defendant cannot win a <u>Batson</u> claim unless there is an exactly identical white juror would leave <u>Batson</u> inoperable; potential jurors are not products of a set of cookie cutters.

<u>Miller-El v. Dretke</u>, 545 U.S. at 247 n.6.

Hardcastle also contends that the prosecutor's assertions that striking Stewart was in accord with her usual practices because Stewart was a young, single, unemployed, unmarried mother living alone are implausible.  The prosecutor testified that she based her assumption that Stewart was unmarried and living alone on Stewart's affirmative response to the question of whether she was "Miss Stewart."  (10/12/06 N.T. at 100-01, 11/15/82 N.T. at 115.)  Stewart was never asked if she lived alone and was never asked her age.  (<u>Id.</u>)  Moreover, there is nothing regarding Stewart's age in the prosecutor's contemporaneous notes of the voir dire.  (11/15/82 N.T at 114-16, Ex. C-1.)  The prosecutor also testified that Stewart's unemployment indicated that she lived in an unstable situation.  (10/12/06 N.T. at 103.)  However, when we asked what in the voir dire transcript indicated that Stewart lived in an unstable situation, the prosecutor could not point to anything.  (<u>Id.</u>)  The prosecutor did not ask Stewart any questions about the stability of her living arrangements.  In fact, the prosecutor did not ask Stewart any questions during voir dire.  (11/15/82 N.T. at 114-16.)  The fact that the prosecutor now claims that these characteristics were important to her decision, even though she asked Stewart no questions about them during voir dire, suggests that the Commonwealth's post hoc reliance on these characteristics is unreasonable: "the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about

is evidence suggesting that the explanation is a sham and a pretext for discrimination." Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000) (cited with approval in Miller-El v. Dretke, 545 U.S. at 246).

Hardcastle also asserts that the Commonwealth treated single African-American members of the venire differently than single Caucasians. The transcript of the voir dire shows that six of the African-American members of the venire the Commonwealth had the opportunity to accept or reject were single and that the prosecutor struck all of them: Lisa Stewart (11/15/82 N.T. at 115-16); William Preston (11/16/82 N.T. at 5, 8); Kim Richards (11/17/82 N.T. at 93, 96); Gladys Workman (11/18/82 N.T. at 41, 46); James Richardson (Id. at 61, 65); and Janice Ferrell (11/19/82 N.T. at 62, 64). In contrast, the prosecutor accepted seven of the eight single Caucasian members of the venire she had the opportunity to accept or reject: Jean Owad (11/15/82 N.T. at 56, 61); Thomas Pytlewski (Id. at 67, 70); Catherine Distel (11/17/82 N.T. at 54, 58); Joseph P. Smith, III (Id. at 78, 83); Robert M. Mckay (11/18/82 N.T. at 23, 27); James Dougherty (Id. at 31, 34); and Marianne Palma (11/19/82 N.T. at 84, 89). She struck Anthony Aiello, a single Caucasian man who was considered as an alternate. (Id. at 96, 99). We find that the prosecutor's reason for striking Stewart also applied to eight Caucasian members of the venire. We further find that the fact that the Commonwealth struck only one of those Caucasian venirepersons is evidence that it is improbable that the Commonwealth relied on this race-neutral reason in this case. See Miller-El v. Dretke, 545 U.S. at 248 ("The fact that [the prosecutor's] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext.").

Hardcastle further argues that the prosecutor's contention that she struck Stewart because she was an unemployed mother who stayed at home with her child, and hence in an unstable situation,

is unpersuasive, because the Commonwealth accepted four other mothers who were unemployed, three of whom were Caucasian.  Dorothy Piotrowski had four children between the ages of four and 17 and was not employed outside the home.  (11/17/82 N.T. at 66-67, 69.)  Anna Tedeschi had two children and was not employed.  (11/17/82 N.T. at 88, 91)  Mary Powell had five children between the ages of 15 and 30 and was not employed outside the home.[9]  (11/18/N.T. at 66-67.)  Margaret Fithian was a homemaker with three adult children.  (11/19/82 N.T. at 100.)   We find that the prosecutor treated Stewart differently than other mothers who were unemployed.

We find that the record of the voir dire in this case does not support the prosecutor's present assertions that Stewart did not quickly understand questions asked during voir dire or that Stewart's living arrangements were unstable.  The record of the voir dire also shows that the prosecutor treated Stewart differently than she did other unemployed mothers and treated single African-Americans, including Stewart, differently than single Caucasians.  We conclude, therefore, that our review of the record of Stewart's voir dire, and our comparison of Stewart with Caucasian members of the venire who possessed similar characteristics, supports Hardcastle's contention that none of the Commonwealth's post hoc race-neutral explanations for the prosecutor's peremptory strike of Stewart are plausible in the context of this case.  We further find, based upon the record, that the Commonwealth has not articulated any plausible race-neutral reasons to support the peremptory strike of Lisa Stewart.

2.   Adrienne Marsh

The prosecutor testified during the Hearing that striking Marsh was consistent with her usual

_____

[9]Mary Powell was the only one of these four women who was African-American, the rest were Caucasian.  (Ex. C-1.)

31

practices for striking jurors because Marsh had heard about the case in the newspaper, had been a school aid for nine years in Mount Airy, and had five children, ages 17-27.  (N.T. 10/12/06 at 53.) As we mentioned previously, the prosecutor stated that she would have assumed, during voir dire, that Marsh would be sympathetic to Hardcastle because of his age, since she had children in that age group and because she had worked with school children for nine years.  (Id.)  Hardcastle contends that the Commonwealth's reliance on these race-neutral reasons is unreasonable.

Although the prosecutor identified Marsh's exposure to pretrial publicity about this case as a reason to strike her, she accepted two other jurors, Elizabeth Milliner (who is African-American) and Joseph Smith, III (who is Caucasian), who also stated during voir dire that they had read about the case in the newspaper.  (11/16/82 N.T. at 82, 87; 11/17/82 N.T. at 77-78, 83, Ex. C-1.)  In addition, while the prosecutor stated that she would have believed, during voir dire, that Marsh's work as a school aid would have made her more sympathetic to Hardcastle, she accepted a white juror, Dorothy Roschen, who was an art teacher in the Philadelphia public school system.  (11/17/82 N.T. at 33, 39.)  When questioned about this discrepancy, she explained that "there's a difference between being a teacher and being an aide.  As far as the level of education, the level of intelligence, and whether or not those factors would make a person a good juror."  (10/12/06 N.T. at 63-64.)  The record does not, however, support the prosecutor's present claim that level of intelligence or education was important to her in selecting both African-American and Caucasian jurors.  Most importantly, although the prosecutor asked Marsh many questions during voir dire, and now professes that Marsh's level of education was relevant to her decision to strike Marsh, she never asked Marsh about her level of education.  (11/16/82 N.T. at 12-14.)  Moreover, the Commonwealth accepted 12 Caucasian members of the venire who did not attend college, two of whom did not even

finish high school:  Jean Owad and James Dougherty did not complete high school, Dougherty

earned an GED (11/15/82 N.T. at 58, 61; 11/18/82 N.T. at 31, 34); Thomas Pytlewski, Claire Hoban,

Patricia Collins, Raymond Paino, Catherine Distel, Dorothy Piotrowski, Anna Tedeschi, Robert

Maher, Robert McKay, and Margaret Fithian did not continue their educations after high school

(11/15/82 N.T. at 68, 70, 98-100, 111, 113, 120, 123; 11/17/82 N.T. at 54, 58, 67, 69, 89, 91, 99,

103; 11/18/82 N.T. at 26-27; 11/19/82 N.T. at 101, 106).

     Our juror by juror comparison also undercuts the Commonwealth's claim that the prosecutor

would have stricken Marsh because she had children close in age to Hardcastle.  Although the

prosecutor struck Marsh and two other African-American members of the venire who had children

near Hardcastle's age, Shirley Davis and Mary Henry, she accepted seven Caucasian members of the

venire who had children near in age to Hardcastle, Dorothy Piotrowski, Donald Vorgity, Margaret

Fithian, Robert Maher, Claire Hoban, Raymond Paino, and Thomas Scutti, and did not consider this

factor to be a reason to strike those jurors.  (11/15/82 N.T. at 39, 42, 95, 98, 100, 120, 123; 11/17/82

N.T. at 48, 50, 67, 69, 98-99, 103; 11/19/82 N.T. at 42, 44, 73, 79, 100, 106.)  Indeed, when

questioned at the Hearing about five of the Caucasian members of the venire she had accepted, the

prosecutor included the fact that they had children among the factors that were consistent with her

practices for accepting jurors.

     When the prosecutor was asked, on direct examination, to list the factors she saw in the voir

dire transcript regarding Dorothy Piotrowski which were consistent with her practices for accepting

jurors, one of the factors she listed was: "[s]he was married with four children, ages four to 17 . .

33

. ."[10]  (10/12/06 N.T. at 68-69.)  When she was asked, on direct examination, what factors she saw

in her notes and the voir dire transcript that presumably led her to accept Donald Vorgity, one of the

factors she listed was:  "[h]e had three children and he seemed like he would be a good juror."[11]

(10/12/06 N.T. at 30.)   When questioned on cross-examination, she confirmed that Vorgity's

children were within the same age range as Hardcastle, who was twenty, but stated that the fact that

Vorgity had three children "was not a reason to strike him."  (1/8/07 N.T. at 76-77.)  When the

prosecutor was asked  to look at her notes and the voir dire transcript and list the factors that existed

with respect to Margaret Fithian that were consistent with her practices for accepting jurors, she

mentioned that Fithian "had three children, ages 31 through 21 . . . ."  (10/12/06 N.T. at 87.)  She

also stated that "[t]here was nothing to indicate that [Fithian] would not have been a good juror."

(Id. at 87-88.)  The prosecutor also testified on direct examination that the fact that Robert Maher

had five children, ages 21 through 32, was consistent with her practices for accepting jurors.  (Id. at

72.)  She similarly testified that the fact that Claire Hoban had nine children was consistent with her

practices for accepting jurors.[12]  (Id. at 45)  The prosecutor also accepted an African-American juror,

Mary Powell, who had five children ages 15-30 (11/18/82 N.T. at 67), and stated, during the

Hearing, that the fact that Powell had five children was consistent with her general practice for

---

[10]The prosecutor also testified that she thought the defense would strike Piotrowski.
(10/12/06 N.T. at 69.)  However, as the Supreme Court has instructed, the fact that the defense may
have decided to exercise a peremptory strike after the Commonwealth accepted a juror is irrelevant
to our analysis.  See Miller-El v. Dretke, 545 U.S. at 245.

[11]Vorgity's three children were between the ages of 18 and 21 at the time of Harcastle's trial.
(11/15/82 N.T. at 39.)

[12]Hoban's children ranged in age from fourteen to thirty at the time of the voir dire.
(11/15/82 N.T. at 98.)

accepting jurors.  (Id. at 79-80.)

The record of the voir dire in this case shows that the prosecutor treated Marsh differently than she did: 1) other members of the venire who were exposed to pre-trial publicity about the case; 2) a Caucasian woman who was also employed in a Philadelphia school; 3) Caucasian members of the venire who did not attend college; and 4) Caucasian members of the venire, and one African-American member of the venire, who had children near in age to Hardcastle.  We find that the fact that the prosecutor's reasons for striking Marsh "also  applied to these other panel members, most of them white, none of them struck" is evidence that it is improbable that the prosecutor struck Marsh for these reasons.  See Miller-El v. Dretke, 545 U.S. at 248.  We also find that the prosecutor's current assertion that she treated Marsh differently than Dorothy Roschen because Roschen had a higher level of education than Marsh is implausible, as the prosecutor never asked Marsh about her education.  See Ex parte Travis, 776 So. 2d at 881.  We conclude, therefore, that our review of the record of Marsh's voir dire, and our comparison of Marsh with Caucasian members of the venire who possessed similar characteristics, supports Hardcastle's contention that the Commonwealth's reliance on these post hoc race-neutral explanations for the peremptory strike of Marsh is unreasonable in the context of this case.  We find that the Commonwealth has not articulated any plausible race-neutral reasons for the prosecutor's peremptory strike of Adrienne Marsh.

3.    William Preston

The prosecutor testified during the Hearing that striking Preston was consistent with her usual practices for striking jurors because Preston was a single man, his sister had been raped six or seven years before and he had not attended the trial, and he couldn't absolutely say that he could bring back

the death penalty.  (N.T. 10/12/06 at 51.)  Hardcastle argues that the Commonwealth's reliance on Preston's marital status as a reason for striking him is unreasonable.  We agree.  As discussed earlier, a comparison of the prosecutor's treatment of single African-American members of the venire with single Caucasian members of the venire demonstrates that the Commonwealth's reliance on Preston's marital status as a non-discriminatory reason for striking him is unreasonable.[13]

Hardcastle also maintains that the Commonwealth's reliance on the rape of Preston's sister as a race-neutral reason for striking him is unpersuasive.  The prosecutor testified that, whether a venireperson's family member had been a crime victim was itself a minor factor in her decision whether to accept or strike that person.  (10/12/06 N.T. at 52.)  She explained that her decision would depend on whether the victim was the venireperson or a family member, "how they were treated by law enforcement, by the D.A.'s office, the Court, [and] whether anyone was arrested or not . . . ."  (Id.)

During voir dire, the prosecutor asked Preston whether anyone had been arrested for the rape of his sister.  (11/16/82 N.T. at 6.)  Two brothers were arrested and tried for the crime.  (Id.)  She also asked Preston if he had attended the trial, he had not.  (Id.)  Although she now claims that she would have found Preston's failure to attend the trial significant, she did not ask Preston why he didn't attend the trial.  (Id. at 6-7.)  She also never asked him what the outcome of the trial was or how he and his sister were treated by law enforcement, the D.A.'s office, or the court in connection with the crime.  (Id.)  The prosecutor did ask Preston whether, as a result of this crime, he had "any

---

[13]Supra at 30.  The transcript of the voir dire shows that the prosecutor struck all six single African-American members of the venire but only one of the eight single Caucasian members of the venire.  (11/15/82 N.T. at 56, 61, 67, 70, 115-16; 11/16/82 N.T. at 5, 8; 11/17/82 N.T. at 54, 58, 78, 83, 93, 96; 11/18/82 N.T. at 23, 27, 31, 34, 41, 46, 61, 65; 11/19/82 N.T. at 62, 64, 84, 89, 96, 99).

feelings about persons accused of crime or the criminal justice system, or anything of that nature, that would in any way prevent [him] from being a fair and impartial juror in [Hardcastle's case.]" (Id. at 6.)  Preston responded "no."  (Id. at 7.)  We find that the Commonwealth's present reliance on this factor is unreasonable in light of the prosecutor's failure to ask Preston why he did not attend the trial, what the outcome of the trial was, or how he and his sister were treated by law enforcement, the D.A.'s Office, and the court.  See Ex parte Travis, 776 So. 2d 881.

A juror by juror comparison of the members of the venire whose relatives were crime victims also undercuts the prosecutor's assertion that she would have stricken Preston because of the rape of his sister.  The prosecutor struck Preston and one other African-American member of the venire who had a close relative who had been a victim of crime, James Richardson.  However, she accepted five Caucasian members of the venire, Dorothy Roschen, Claire Hoban, James Dougherty, Frances Sternfeld, and Margaret Fithian, who had close relatives who had been victims of crime and  also accepted an African-American juror, Elizabeth Milliner, who had herself been a victim of a property crime.

James Richardson: The prosecutor testified at the Hearing that the fact that Richardson's brother had been killed eight years before and no one had been arrested was a factor which was consistent with her practice for striking jurors.  (10/12/06 N.T. at 78.)  She stated that it was her practice not to take jurors "where someone has been killed, and no one has been arrested" in a case where someone was arrested for murder because "sometimes they hold it against the homicide detectives, because their case of their family members wasn't solved, and yet this case was . . .  my view is that they would somehow hold that against the Commonwealth in the decision-making." (Id. at 78-79.)  During voir dire, Hardcastle's counsel asked Richardson whether there was anything

about the murder of his brother "that might cloud [his] judgment in this if [he] was to sit on this jury?" (11/18/82 N.T. at 62.)  Richardson responded "No, sir."  (<u>Id.</u>)  Hardcastle's attorney also asked Richardson if there was anything about the nature of this case, the stabbing deaths of two people, that alone or with the murder of his brother, "would upset [him] or interfere with [his] ability to sit and listen to all the evidence."  (<u>Id.</u>)  Richardson replied "I don't think so, no."  (<u>Id.</u>) Richardson also responded in the negative when asked whether there was "anything about that which might emotionally disturb [him] to where [he] couldn't discuss this case with the other jurors when it came time to deliberate."  (<u>Id.</u>)  Richardson then agreed that he could "reach a fair and impartial verdict."  (<u>Id.</u> at 63.)  The prosecutor did not ask Richardson anything about the murder of his brother, or about how he and his family were treated by law enforcement, the D.A.'s office, or the court.  (<u>Id.</u> at 63-65.)

<u>Dorothy Roschen</u>:  The mother of juror Dorothy Roschen was a crime victim.  The prosecutor testified that the fact that Roschen's "mother had been the victim of a purse snatch, but she indicated that it would not interfere with her ability to be fair" was a factor consistent with her practices for accepting a juror.  (10/12/06 N.T. at 63.)  The prosecutor explained the difference in her treatment of Preston and Roschen with respect to this factor as follows:

> No one was arrested in the case of the purse snatch with Ms. Roschen, and someone had been arrested in the case of the rape of Mr. Preston's sister, and yet he had not attended the trial with his sister.  Because no one was arrested in the case of Ms. Rochen's [sic] mother's case, we couldn't ask whether or not she had attended the trial with her mother, because there wasn't one.

(<u>Id.</u> at 64.)  This explanation is not consistent with the record of Roschen's voir dire.  Roschen was not asked, and did not volunteer, whether anyone was arrested for the theft or how she and her

mother were treated by law enforcement, the D.A.'s office, or the court.  (11/17/82 N.T. at 32-39.)

Indeed, the entire voir dire of Roschen regarding the theft of her mother's purse consisted of three

questions:

> Q.  Has any member of your immediate family or you yourself ever
> been the victim of a crime of violence?
>
> A.  (No response.)
>
> Q.  Including things like a purse snatch?
>
> A.  Yes, my mother was – her purse was snatched in Baltimore.
>
> Q.  Would that incident or anything else that you know of in any way
> interfere with your ability to be a fair and impartial juror in this case?
>
> A.  As far as I know, no.

(11/17/82 N.T. at 34.)

<u>Claire Hoban</u>:  The sons of juror Claire Hoban were also crime victims.  The prosecutor

testified that the fact that Claire Hoban's sons had been robbed on their paper route was a factor

consistent with her practices for accepting a juror.  (10/12/06 N.T. at 45.)  The prosecutor's

contemporaneous notes of the voir dire state that two of Hoban's sons were robbed on their paper

route by two teenagers, one black and one white, and that the teenagers were apprehended.  (Ex. C-1,

1/18/07 N.T. at 47.)  Hoban was not asked during voir dire whether she attended the trial of the

teenagers that robbed her sons, or how she and her sons were treated by law enforcement, the D.A.'s

office, or the court.  (11/15/82 N.T. at 96-100.)

<u>Elizabeth Milliner</u>:  Elizabeth Milliner, the only African-American juror, was herself a crime

victim, as her home had been burglarized twelve to fifteen years prior to Hardcastle's trial.

(11/16/82 N.T. at 81.)  The prosecutor testified that the fact that Milliner's home had been

burglarized was a factor consistent with her practices for accepting a juror. (10/12/06 N.T. at 59.) During voir dire, Milliner was asked if the burglary would affect her ability to weigh the facts in Hardcastle's case and she said that she "would try to be fair" and try to determine Hardcastle's guilt or innocence independent of any bias she might have arising from the burglary. (11/16/82 N.T. at 81-82.) Milliner was not asked whether anyone was arrested for the burglary or how she was treated by law enforcement, the D.A.'s office, or the court. (Id. at 79-87.)

James Dougherty: James Dougherty's sister was a crime victim. (11/18/82 N.T. at 33-35.) The prosecutor testified that the fact that Dougherty's sister had been robbed and beaten was a factor that was consistent with her practices for accepting a juror. (10/12/06 N.T. at 74-75.) No one was arrested for the attack on Dougherty's sister. (11/18/82 N.T. at 33.) Dougherty was not asked how he or his sister were treated by law enforcement. (Id. at 33-35.)

Frances Sternfeld: Frances Sternfeld's son-in-law was also a crime victim. (11/18/82 N.T. at 74.) The prosecutor testified that the fact that Sternfeld's "sister-in-law [sic] had been the victim of a mugging and had had a broken collar bone" was consistent with her practices for accepting jurors.[14] (10/12/06 N.T. at 80.) Sternfeld was not asked in voir dire whether anyone was arrested for the mugging or how she and her son-in-law were treated by law enforcement, the D.A.'s office, or the court. (11/18/82 N.T. at 73-80.)

Margaret Fithian: Margaret Fithian's daughter was also a crime victim. (11/18/82 N.T. at 74.) The prosecutor testified that the fact that Fithian's "daughter's car had been broken into a week-

---

[14]During the Hearing, the prosecutor misidentified Sternfeld's family member who was a crime victim as her sister-in-law. (10/12/06 N.T. at 80.) Sternfeld, however, testified during voir dire that her son-in-law was the victim of a mugging on West River Drive and suffered a broken collar bone. (11/18/82 N.T. at 74.)

and-a-half before" was a factor consistent with her practices for accepting jurors. (10/12/06 N.T. at 87.) Fithian was not asked in voir dire whether anyone was arrested for this crime or how she and her daughter were treated by law enforcement. (11/19/82 N.T. at 101-05.) Indeed, the prosecutor did not ask Fithian any questions about this crime or whether it would affect her ability to be a fair and impartial juror. (Id. at 102-05.)

We find that the prosecutor treated Preston and Richardson differently from Caucasian jurors, and the one African-American juror whom she accepted, who also had relatives who had been victims of crime. We further find, accordingly, that it is improbable that this factor would have played a part in the prosecutor's decisions to strike Preston and Richardson. See Miller-El v. Dretke, 545 U.S. at 248. We also find that the prosecutor's assertion that her treatment of a venireperson who had a relative who was the victim of a crime depended on whether the victim was the venireperson or a family member, "how they were treated by law enforcement, by the D.A.'s office, the Court, [and] whether anyone was arrested or not" (10/12/06 N.T. at 52), is unsupported by the record. The prosecutor did not ask Preston, Roschen, Hoban, Milliner, Dougherty, Sternfeld, or Fithian how they were treated by law enforcement, the D.A.'s Office or the court. She also did not ask Roschen, Milliner, Sternfeld or Fithian whether anyone had been arrested in their cases. We conclude, accordingly, that the Commonwealth's reliance on this factor as a race-neutral reason for striking African-American members of the venire is unreasonable within the context of this case. See Ex Parte Travis, 776 So.2d at 881.

Hardcastle also contends that the prosecutor's assertion that Preston's position on the death penalty was consistent with her practice of striking jurors is unconvincing. The prosecutor testified during the hearing that she would not have taken Preston because of his view on the death penalty:

> As to the death penalty, he couldn't say absolutely he could bring it back. Said he doesn't know too much about it. He would keep an open mind toward it, but when he was asked the question about the death penalty by the Court, I believe, he said, Yeah, but. I didn't - - in a review of the record, I believe that from my practice I would not have taken him because he was not definite that he could bring back a death penalty in a case where we were seeking it.

(10/12/06 N.T. at 51-52.)  During voir dire, Preston was initially questioned about the death penalty

by Judge Malmed:

> The Court:  Do you have any religious, moral or ethical beliefs which could prevent you from voting for the death penalty, assuming a proper case for it has been made out?
>
> The Witness:  No.
>
> The Court:  You could vote for the death penalty. Is that what you are saying?
>
> The Witness: I would use an open mind to that. I am not really too much, you know, I am not too familiar about what is all involved, but I would use an open mind about it.

(11/16/82 N.T. at 4.)  The prosecutor also asked Preston about the death penalty:

> Q.   Mr. Preston, do you have any moral, religious, ethical or conscientious beliefs known only to yourself which would prevent you from returning a verdict of guilty of murder in the first degree in a proper case?
>
> A.  No.
>
> Q.  And you indicated, I believe, that you were not conscientiously opposed to the death penalty as far as you know.
>
> A.  Yeah, but I don't know too much about it, but I would, you know, keep an open mind toward it.
>
> Q.  Okay. Will you follow the Court's instructions on the law if you are selected as a juror whether or not you personally agree with that law or whether or not you think something else might be better law?

42

A.  Yes.

(Id. at 7.)  Hardcastle contends that the Commonwealth's reliance on Preston's responses to these

questions as a race neutral reason for striking him is unpersuasive because the prosecutor accepted

Caucasian members of the venire who responded similarly to questions about their ability to impose

the death penalty.

Juror Robert Maher, who is Caucasian, was accepted by the Commonwealth even though his

responses to the court's death penalty questions were similar to Preston's:

> The Court: Do you have any religious, moral or ethical beliefs which
> could prevent you from voting for the death penalty in a proper case?
>
> The Juror: No, I suppose not.   It would be according to the
> circumstances.  I never had to make that decision.
>
> The Court: Pardon me?
>
> The Juror: I never had to make that decision.

(11/17/82 N.T. at 97.)  The prosecutor accepted Maher without asking him any further questions

regarding his ability to impose the death penalty.  (Id. at 98-101.)  The Commonwealth also accepted

John Devenny, who is Caucasian, as a juror, even though he indicated, in his responses to questions

asked by the court, that he had religious beliefs that could prevent him from returning the death

penalty:

> The Court: Do you have any religious, moral or ethical beliefs which
> could prevent you from voting for the death penalty in a proper case?
>
> The Witness: There may be, yes.  I am a Catholic and I think I would
> have difficulty deciding whether someone would die or not.
>
> The Court: You might have difficulty.  The question is could you?
>
> The Witness: I think I could, yes.

(11/18/82 N.T. at 35-36.) In response to further questions by the prosecutor, Devenny indicated that

he would be able to follow the judge's instructions and consider the appropriateness of imposing the

death penalty:

> Q.  You indicated originally in response to the judge's question that
> you had some feelings against the imposition of capital punishment.
>
> A.  Yes.
>
> Q.  Is that a fixed opinion on your part?
>
> A.  No, it is not a fixed opinion.
>
> Q.   Do you think if you were a juror in this case and if the jury
> returned a verdict of guilty of murder in the first degree, that you
> would be able to give consideration to the factual pattern that would
> be given to you and to the legal instructions that the judge would give
> you and be able to decide whether or not it was appropriate for the
> death penalty in accordance with the law?
>
> A.  Yes.

(Id. at 39.)  The prosecutor was asked during the Hearing whether Devenny's answers to these capital

punishment questions would have been a dispositive factor in her decision whether to accept him

as a juror.  (10/12/06 N.T. at 76.)  She stated that his responses were not dispositive because he did

not strongly state that he could not return the death penalty and because he stated that he did not have

any moral, religious, ethical or conscientious beliefs which would prevent him from returning the

death penalty:

> Q.  So it's fair to say that that would not, under the circumstances
> given your practices, that would not be a dispositive factor for you?
>
> A.  Right, because when he was asked a specific question of whether
> he had any moral, religious, ethical, conscientious beliefs which
> would prevent him from returning a verdict of guilty of murder in the

first degree, he said, No.  And he answered that he could bring back
a death penalty despite his own - - his own personal views.

(Id.)  We find that the prosecutor treated Preston differently with respect to the death penalty than

two Caucasians whom she accepted as jurors.  Preston stated that he had no "religious, moral or

ethical beliefs which could prevent you from voting for the death penalty," that he would keep an

open mind about imposing the death penalty in Hardcastle's case, and that he would follow the

court's legal instructions.  (11/16/82 N.T. at 4, 7.)  The prosecutor now claims that it would have

been consistent with her usual practices to reject Preston because "he was not definite that he could

bring back a death penalty . . . ."  (10/12/06 N.T. at 51-52.)  However, she accepted Maher as a juror

even though he was equivocal about whether he had "any religious, moral or ethical beliefs which

could prevent [him] from voting for the death penalty" and stated that his decision whether to impose

the death penalty would depend on the circumstances.  (11/17/82 N.T. at 97.)  She also accepted

Devenny, even though he stated that he had religious beliefs that would make it difficult for him to

impose the death penalty (11/18/82 N.T. at 35-36) and, upon further questioning, indicated that he,

like Preston, would follow the judge's legal instructions (id. at 39.)  We find, accordingly, that it is

implausible that the prosecutor struck Preston because of his answers to the death penalty questions.

See Miller-El v. Drekte, 545 U.S. at 248.

We conclude, therefore, that our review of the record of Preston's voir dire, and our

comparison of Preston with Caucasian members of the venire who possessed similar characteristics,

supports Hardcastle's contention that the Commonwealth's reliance on the prosecutor's post hoc race-

neutral explanations for the peremptory strike of Preston is unreasonable.  We further find that the

Commonwealth has not articulated any plausible race-neutral reasons to support the prosecutor's

45

peremptory strike of William Preston.

        4.    <u>Kim Richards</u>

The prosecutor testified during the Hearing that striking Richards was consistent with her usual practices for striking jurors because Richards was 26-years-old, lived alone, had a college degree in psychology, and was over-qualified for her job as a secretary.  (10/12/06 N.T. at 71.) Hardcastle argues that none of these race-neutral reasons for striking Richards is plausible.

Hardcastle contends that the prosecutor's assertion that Richards' age was consistent with her reasons for striking jurors is improbable because she did not strike Caucasian members of the venire close in age to Richards.  The record of the voir dire shows that four of the African-American members of the venire whom the Commonwealth had the opportunity to accept or reject were in their twenties and that the prosecutor struck all of them:  Kim Richards, age 26 (11/17/82 N.T. at 96);Gladys Workman, age 24 (11/18/82 N.T. at 41, 46); and Lorraine Fox, age 23 (<u>Id.</u> at 58); and Janice Ferrell, age 20 (11/19/82 N.T. at 62, 64).  The record also shows that the Commonwealth accepted all six Caucasian members of the venire who were in their twenties:  Richard Laverty, age 28 (11/17/82 N.T. at 25, 31); Catherine Distel, age 22 (<u>Id.</u> at 54, 58); Joseph Smith, age 24 (<u>Id.</u> at 78, 83);  John Dougherty, age 28 (11/18/82 N.T. at 31, 34); John Devenney, age 26 (<u>Id.</u> at 38, 40); and Maryanne Palma, age 25 (11/19/82 N.T. at 84-85, 89).  We find, accordingly, that it is improbable that this factor would have played a part in the prosecutor's decisions to strike Richards.  <u>See</u> <u>Miller-El v. Dretke</u>, 545 U.S. at 248.

Hardcastle also asserts the prosecutor's reliance on Richards' living arrangements as a basis for striking her is unconvincing.  Although the prosecutor states that she would have stricken Richards because she lived alone, Richards was never asked if she lived alone, she was asked if she

lived with any members of her immediate family. (11/17/82 N.T. at 96.) She did not. (Id.) In addition, the record shows that the prosecutor treated African-American members of the venire who lived alone, or did not live with members of their immediate family, differently than Caucasian members of the venire who lived alone, or did not live with any members of their immediate family. The prosecutor struck all three of the African-American members of the venire who lived alone or did not live with any members of their immediate family: William Preston, who lived alone (11/16/82 N.T. at 5, 8); Kim Richards, who did not reside with any members of her immediate family (11/17/82 N.T. at 96); and Lorraine Fox, who did not live with any members of her immediate family (11/18/82 N.T. at 59-60). She accepted both of the Caucasian members of the venire whom the record shows lived alone or did not live with any members of their immediate family: Sarah Smith, who lived alone (11/16/82 N.T. at 17, 22) and Jean Owad, who did not live with any members of her immediate family (11/15/82 N.T. at 58, 61). The prosecutor did not even bother to ask three other single Caucasian members of the venire, Thomas Pytlewski, Dorothy Roschen, and Robert McKay, whether or not they lived alone. (11/15/82 N.T. at 63-70; 11/17/82 N.T. at 33-39; 11/18/82 N.T. at 22-27.) We find that the fact that the prosecutor struck African-American members of the venire who shared this characteristic, and accepted Caucasian members of the venire who shared this characteristic, is evidence that it is unlikely that this factor played any part in her decision to strike Richards. See Miller-El v. Dretke, 545 U.S. at 248.

Hardcastle also argues that the prosecutor's assertion that she would have stricken Richards because she had a degree in psychology and was over-qualified for her secretarial job is not credible. The prosecutor testified that psychology is "one of those fields where people tend to look beyond the facts of the case and start looking for reasoning and psycho-analyzing people, and situations . . . ."

(10/12/06 N.T. at 71.)   She also testified that Richards was not working in the kind of field she believed "she would be working in as a graduate in psychology.  So there was something there that would give me hesitation . . . in picking her."  (Id.)  Hardcastle contends that the prosecutor's assertions are unconvincing because she accepted as jurors two single Caucasian women who were employed in administrative positions even though they had taken college courses.  The prosecutor accepted Sara Smith, who worked as a keypunch operator at a bank even though she had taken courses at Temple University and the University of Pennsylvania in English and Philosophy. (11/16/82 N.T. at 18, 20-21.)  She also accepted Maryanne Palma, who worked in the accounting department of an insurance company even though she had completed two years of science coursework at Temple University.  (11/19/82 N.T. at 85, 87-90.)  We find that Richards is not comparable to Smith and Palma, neither of whom had completed their college degrees and neither of whom had studied psychology.  We further find, therefore, that it is more likely than not that the prosecutor would have stricken Richards because she had a degree in psychology and was underemployed. Consequently, we conclude that the Commonwealth has articulated a plausible race-neutral reason for the peremptory strike of Kim Richards.

     5.    <u>James Richardson</u>

     The prosecutor testified that there were three factors regarding Richardson that were consistent with her practices in striking jurors:  1) he was a DPW caseworker, 2) he was a meat cutter before he went to work for DPW, which was an unusual occupation change, and 3) his brother had been killed three years before and no one had been arrested.  (10/12/06 N.T. at 78.)  Hardcastle maintains that the Commonwealth's reliance on these race-neutral reasons for striking Richardson is unreasonable in the context of this case.  As we discussed previously, we have found that the prosecutor treated

Richardson differently than Caucasian jurors (and one African-American juror) who had relatives who had been victims of crime.[15]

The prosecutor also testified that Richardson's job as a DPW caseworker was a factor that was consistent with her practices for striking jurors because that "is an occupation that gets people into other people's lives and homes" and because "with a DPW caseworker, it's an occupation where he might be a little more sympathetic to the defendant." (10/12/82 N.T. at 78-79.) Hardcastle asks us to find that this explanation is improbable because the prosecutor did not strike Dorothy Roschen who was a public school art teacher (11/17/82 N.T. at 33, 39); Robert Maher who was a SEPTA train man (Id. at 98, 103); Robert McKay, who worked as a personnel assistant for the Philadelphia Gas Works (11/18/82 N.T. at 22, 27); and Teresa Petruska, who was a registered nurse (11/19/82 at 66, 71). Hardcastle contends that the occupations of these Caucasian jurors make them comparable to Richardson because their "jobs analogously put people into other people's lives." (Pet. Proposed Findings of Fact ¶188.) We do not find that the occupations of art teacher, train man, personnel assistant or registered nurse are analogous to that of DPW caseworker. Consequently, we conclude that it is more likely than not that the prosecutor struck Richardson because he worked as a caseworker for DPW and, therefore, might have been more sympathetic to the defendant.[16] We also find, accordingly, that the Commonwealth has articulated a plausible race-neutral reason for the peremptory strike of James Richardson.

---

[15]Supra at 36-41.

[16]We do not make any factual findings with regard to the prosecutor's assertion that she would have been influenced by Richardson's career change.

49

6.      Lorraine Fox

The prosecutor testified during the Hearing that striking Fox was consistent with her usual practices for striking jurors because Fox was "23 and single, but the biggest factor was her brother had gone to jail for robbery, she attended the trial four years before, that would have been sufficient right there, under my practices, for me not to have accepted the juror." (10/12/06 N.T. at 78.) Hardcastle contends the Commonwealth's reliance on these race-neutral reasons for striking Fox is unreasonable in the context of this case. As we have previously discussed, the record establishes that the prosecutor treated single African-American members of the venire differently than single Caucasians, and African-Americans in their twenties differently than Caucasians in their twenties.[17] We find that the fact that the prosecutor struck African-Americans who were single and/or were in their twenties, and accepted Caucasians who were single and/or were in their twenties, is evidence that it is improbable that she struck African-American members of the venire on this basis in this case. See Miller-El v. Dretke, 545 U.S. at 248.

Hardcastle also contends that the prosecutor's assertion that she would have stricken Fox because her brother had gone to jail for robbery is unconvincing. The prosecutor questioned Fox about her brother's robbery conviction during voir dire:

> Q.  Have you or has any member of your immediate family or any
> close friend ever been the victim of a crime of violence?
>
> A.  Yes.
>
> Q.  What is the relationship of that person to you?
>
> A.  Brother.

---

[17]Supra at 30-31, 46.

Q.  And what happened to your brother?

A.  He went to jail.

Q.  What was the nature of the case?

A.  Robbery.

Q.  How long ago did that occur?

A.  Four years ago.

Q.  Did you attend the trial?

A.  Yes.

Q.  As a result of that trial, do you bear any ill will toward the Police Department, the District Attorney's Office or the court system?

A.  No.

Q.  (Continuing) for the way in which he was treated?

A.  No.

Q.  Were you living in the same household at the time that it occurred?

A.  No.

(11/18/82 N.T. at 59-60.)  The prosecutor did not ask Fox any questions about her relationship with her brother, and did not ask any other questions intended to elicit whether Fox would be biased against the prosecution during the Hardcastle trial as a result of her brother's conviction.  (Id. at 58-60)  Consequently, the only information the prosecutor had about the effect of this incident on Fox was that Fox bore no ill will toward the police, the district attorney's office or the courts as a result of her brother's arrest and conviction.  None of the Caucasian jurors accepted by the Commonwealth

51

had relatives who had been convicted of a crime, so there is no one who can be directly compared with Fox.  However, the Commonwealth accepted James Dougherty despite the fact that he and his girlfriend had been convicted of assault three years prior to the Hardcastle trial and both served terms of probation.  (Id. at 32-33.)  Based upon the record, we find that the prosecutor's present assertion that striking Fox would have been consistent with her practices for striking jurors because her brother went to jail for robbery is unconvincing.  See Miller-El v. Dretke, 545 U.S. at 246 (finding "no good reason to doubt" that the State's assertion that an African-American member of the venire had been stricken because his brother had a previous conviction "was anything but makeweight" where the state had asked the juror no questions about the influence his brother's conviction might have on him).

We find, accordingly, that our review of the record of Fox's voir dire and our comparison of Fox with Caucasian members of the venire who possessed similar characteristics support Hardcastle's argument that the Commonwealth's reliance on the prosecutor's post-hoc race neutral explanations for the peremptory strike of Fox is unreasonable in the context of this case.  We also find that the Commonwealth has not articulated a plausible race-neutral reason for striking Lorraine Fox.

7.   Gladys Workman

The prosecutor testified during the Hearing that striking Workman was consistent with her usual practices for striking jurors because Workman was 24, worked as a data entry operator for an insurance company, had had one year of college as an x-ray technician, attended William Penn High School, was very nervous, and indicated that she would not follow the Court's legal instructions.  (10/12/06 N.T. at 77.)  Hardcastle contends that none of these factors is plausible.  As we have

previously discussed, the record establishes that the prosecutor treated African-American members of the venire in their twenties differently than Caucasian members of the venire in their twenties.[18] Indeed, the Commonwealth accepted Joseph Smith who was the same age as Workman (11/17/82 N.T. at 78, 83) and Catherine Distel who, at age 22, was younger than Workman (11/17/82 N.T. at 54, 58).

The prosecutor did not explain why she thought Workman's employment and education were reasons why she would have stricken her.  A juror by juror comparison shows that the prosecutor accepted Caucasian members of the venire who, like Workman, held administrative positions, and accepted Caucasian members of the venire who, like Workman, had completed high school but did not attend or complete college:  Claire Hoban worked in the business office of Abington Hospital and did not attend college (11/15/82 N.T. at 95, 99-100); Robert McKay worked as a personnel assistant for the Philadelphia Gas Works and did not attend college (11/18/82 N.T. at 22, 26); Maryanne Palma worked in the accounting department of an insurance company and had completed only two years of college (11/19/82 N.T. at 85, 87-90);  Sara Smith worked as a keypunch operator at a bank and had taken some college courses (11/16/82 N.T. at 18-21); Catherine Distel was a manual coder for an insurance company and did not attend college (11/17/82 at 54-55); Thomas Pytlewski, Patricia Collins, Raymond Paino, Dorothy Piotrowski, Anna Tedeschi, Robert Maher, and Margaret Fithian did not continue their educations after high school (11/15/82 N.T. at 68, 111, 120; 11/17/82 N.T. at 67, 89, 99; 11/19/82 N.T. at 101).

The prosecutor's assertion that Workman appeared very nervous is supported by the record,

---

[18]Supra at 46.

in fact, she instructed Workman to relax because she looked nervous during voir dire.  (11/18/82 N.T. at 42.)  The prosecutor has not, however, explained why it would have been her practice to strike members of the voir dire who appear nervous.  Moreover, she did not strike a Caucasian member of the venire, Claire Hoban, who, when asked if she knew of any reason why she "could not or should not serve on this jury" replied "nervous."  (11/15/82 N.T. at 99-100.)  The prosecutor simply instructed Hoban "just try to relax" and accepted her as the second juror selected.  (Id. at 100.)

The prosecutor also asserted that it would have been her usual practice to strike Workman because she indicated four times that she would not follow the court's instructions as to the law.  (10/12/06 N.T. at 77.)  In response to questioning by the prosecutor, Workman did, initially, say that she would not follow the judge's legal instructions if she did not agree with them, but, after follow-up questioning, stated that she would follow the law as given to her by the court:

> Q.  My question is will you follow the judge's legal instructions even if perchance you did not agree with them, or even if you thought something else should be the law?
>
> A.  No.
>
> Q.  You would not?
>
> A.  No.
>
> Q.  Even though that would be part of your oath as a juror?
>
> A.  No.
>
> Q.  You would have to follow your own opinion on what the law should be?
>
> A.  Yes.

The Court: this is only the law.

The Witness: Okay.

By Mrs. Rubino:  Q.  In other words, you would decide the facts, but you must take the law as given to you by the Court even if you don't agree with it.

A.  Oh, okay, yes.

Q.  Could you do that?

A.  Yes.

(11/18/82 N.T. at 43-44.)  The prosecutor accepted a Caucasian member of the venire, Jean Owad, who, like Workman, initially indicated that she would not follow the judge's legal instructions if she did not agree with them.  Owad was questioned on this topic initially by the prosecutor:

Q.  If you are selected as a juror in this case, Miss Owad, would you follow the judge's instructions on the law, whether or not you personally agree with that law and whether or not you think something else might be better?

A.  No.

Q.  You would not?

A.  No.  Well, it all depends.  I don't know what you mean.

Q.  Well, the facts of the case, what happens would be solely in the province of the jurors.  You would decide what occurred from the evidence you heard in the courtroom.  However, in order to reach a verdict, the jurors would have to apply the legal instructions given by the judge to the facts as you find them.  Do you understand that so far?

A.  Yes.

Q.  My question is will you follow the judge's instructions?

A.  Yes.

55

Q.  Even if for some reasons you disagreed with them or even if you thought something else should be the law?

A.  Yes.

Q.  Do you have any doubt about that?

A.  No.

Q.  You are not trained in the law, I assume.

A.  No, I am not.

Q.  You would follow what the judge tells you the law is.

A.  Like I said, it all depends on what he said to me.

Q.  Part of you oath as a juror would be that you have to follow it.

A.  Okay.

Q.  Continuing without question.

A.  Yes.

Q.  Could you do that?

A.  Yes.

(11/15/82 N.T. at 59-60.)  Hardcastle's counsel then asked a few follow-up questions:

Q.  - - is there any doubt in your mind as to - - are you saying that you might follow some of the law the judge explained to the jury and not follow others?

A.  I can't explain myself, you know.  I would follow his law, probably.

Q.  When you say probably, do you mean that there might be an instance where you wouldn't?

A.  On this case?

> Q.  Yes.
>
> A.  Probably.
>
> Q.  If you disagreed with it.
>
> A.  Yes.

(Id. at 60-61.)  The record establishes that the prosecutor struck an African-American juror who, although at first hesitant, in the end stated that she would follow the judge's instructions on the law even if she disagreed with them, and accepted a Caucasian juror who, in the end, stated that she probably would not follow the judge's legal instructions if she disagreed with them.

We find that the fact that the prosecutor's reasons for striking Workman also applied to many of the Caucasian members of the venire, all of whom were accepted by the Commonwealth, renders the prosecutor's post hoc race-neutral reasons for striking Workman  unconvincing.  See Miller-El v. Dretke, 545 U.S. at 248. We conclude, therefore, that our review of the record of Workman's voir dire, and our comparison of Workman with Caucasian members of the venire who possessed similar characteristics, supports Hardcastle's contention that none of the prosecutor's post hoc race-neutral explanations for her peremptory strike of Workman are plausible in the context of this case.  We also find that the Commonwealth has not articulated a plausible race-neutral reason for striking Gladys Workman.

        8.     Janice Ferrell

The prosecutor testified during the Hearing that striking Ferrell was consistent with her usual practices for striking jurors because Ferrell was "single, unemployed, she was the exact same age as the defendant, and I thought she was too young." (10/12/06 N.T. at 82.)  Hardcastle contends that these factors are insufficient to rebut the inference of discrimination.  At the time of the voir dire,

Ferrell was an unemployed twenty-year-old high school graduate who lived with her mother. (11/19/82 N.T. at 62-63.)   As we have previously discussed, the record establishes that the prosecutor treated African-American members of the venire in their twenties differently than Caucasian members of the venire in their twenties.[19]   Indeed, the Commonwealth accepted Catherine Distel who, at age 22, was barely older than Ferrell.  (11/17/82 N.T. at 54, 58).   In addition, the prosecutor accepted Dorothy Piotrowski, Anna Tedeschi, Margaret Fithian and James Dougherty as jurors even though they were not employed. (11/17/82 N.T. at 67, 69, 88, 91; 11/18/82 N.T. at 30-34; 11/19/82 N.T. at 100.)  We find, accordingly, that it is improbable that the prosecutor struck Ferrell for these reasons.  See Miller-El v. Dretke, 545 U.S. at 248.  We further find that the Commonwealth has not articulated a plausible race-neutral reason for the peremptory strike of Janice Ferrell.

V.     CONCLUSION

        We have found that the Commonwealth has not articulated plausible race-neutral reasons for the peremptory strikes of six African-American members of the venire:  Lisa Stewart, Adrienne Marsh, William Preston, Lorraine Fox, Gladys Workman, and Janice Ferrell.  Consequently, we conclude that the strikes of these jurors "correlate with no fact as well as they correlate with race." Miller-El v. Dretke, 545 U.S. at 266.  We have also considered that Hardcastle's trial took place during a time in which it was the law of the Commonwealth of Pennsylvania that "the race, creed, national origin, sex or other similar characteristics of a venireman may be proper consideration in exercising peremptory challenges when issues relevant to these qualities are present in the case." Henderson, 438 A.2d at 953.  It is clear from the record of this case that the prosecutor was aware

_____

[19] Supra at 46.

of <u>Henderson</u> and relied on <u>Henderson</u> in her initial opposition to Hardcastle's claim that she had engaged in racially discriminatory jury selection.  We have also noted that the prosecutor was conscious of, and kept notes of, the race of each member of the venire, and struck 12 of the 14 African-American veniremen she had the opportunity to select for jury service, or 85.71%, but only 2 of the 24 Caucasians, or 8.3%.  Having carefully considered all of the evidence on the record before us, we find that Hardcastle has satisfied his burden of establishing, by a preponderance of the evidence, that the Commonwealth's strikes of African-American members of the venire Lisa Stewart, Adrienne Marsh, William Preston, Lorraine Fox, Gladys Workman, and Janice Ferrell were motivated by race in violation of the Equal Protection Clause of the Fourteenth Amendment. Consequently, the proper relief in this case is to grant the writ, vacate Petitioner's conviction, and allow the Commonwealth of Pennsylvania to retry Petitioner within 180 days of the date of the accompanying order.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD HARDCASTLE, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | (DEATH PENALTY |
| v. | : | HABEAS CORPUS) |
| | : | |
| MARTIN HORN, ET AL., | : | |
| Respondents | : | NO. 98-3028 |

**O R D E R**

**AND NOW**, this 19th day of October, 2007, upon consideration of the Petition for Writ of
Habeas Corpus (Docket No. 5), the Order of the United States Court of Appeals for the Third Circuit
in Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004), all documents filed in connection with the
Petition, the evidentiary hearing held on October 12, 2006 and January 8, 2007 and the argument
held on June 6, 2007, **IT IS HEREBY ORDERED** that the Petition for a Writ of Habeas Corpus
is **GRANTED**.   **IT IS FURTHER ORDERED** that Petitioner's convictions for First Degree
Murder, Burglary and Arson in Commonwealth v. Hardcastle, Nos. 3288, 3289, 3290, 3291, 3293,
June Session, 1982 (Ivins, J.), are **VACATED**.   The Commonwealth of Pennsylvania may retry
Petitioner on these charges within 180 days of the date of this Order.

BY THE COURT:


/s/ John R. Padova

_____

John R. Padova, J.